**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| GREATAMERICA LEASING CORPORATION, | |
| Plaintiff, | No. 09-CV-137-LRR |
| vs. | **ORDER** |
| WAHOO PRODUCTIONS OF FLORIDA, INC., | |
| Defendant. | |

———————————

### *TABLE OF CONTENTS*

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*    *FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

     *A.*    *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
     *B.*    *The Restaurants* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
     *C.*    *Sonny Leverock* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
     *D.*    *Wahoo Seeks Financing* . . . . . . . . . . . . . . . . . . . . . . . . . *5*
     *E.*    *The Lease Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
     *F.*    *Telephone Verification* . . . . . . . . . . . . . . . . . . . . . . . . . *8*
     *G.*    *The Addendum* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
     *H.*    *Parties' Performance* . . . . . . . . . . . . . . . . . . . . . . . . . *11*
     *I.*    *Wahoo's Dispute With ASI* . . . . . . . . . . . . . . . . . . . . . . *12*
     *J.*    *Wahoo Fires Leverock* . . . . . . . . . . . . . . . . . . . . . . . . . *13*
     *K.*    *Brody's Alleged Signature on the Addendum* . . . . . . . . . . . . . *13*

*IV.*    *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

     *A.*    *Liability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*
         *1.*    *Hell or high water clause* . . . . . . . . . . . . . . . . . . *14*
         *2.*    *Parties' arguments* . . . . . . . . . . . . . . . . . . . . . *15*
         *3.*    *Lack of delivery is not a defense* . . . . . . . . . . . . . *16*
         *4.*    *Risk of loss* . . . . . . . . . . . . . . . . . . . . . . . . *18*

|   | 5. | Unconscionability | 19 |
|   | 6. | Other considerations | 20 |
|   | 7. | Conclusion | 21 |
| B. | Damages | | 21 |
|   | 1. | The Motion | 21 |
|   |   | a. Hog Heaven | 22 |
|   |   | b. Resale | 22 |
|   |   | c. Proof of amount of damages | 24 |
|   | 2. | Amount of damages | 24 |
| V. | CONCLUSION | | 25 |

## I. INTRODUCTION

This matter is before the court following a bench trial on Plaintiff GreatAmerica Leasing Corporation's ("GreatAmerica") breach of contract claim. For the reasons explained below, the court concludes that GreatAmerica is entitled to judgment in its favor.

## II. PROCEDURAL HISTORY

On August 28, 2009, GreatAmerica filed a "Petition at Law" ("Complaint") (docket no. 4) in the Iowa District Court for Linn County, case no. LACV066601, against Defendants Wahoo Productions of Florida, Inc. ("Wahoo") and Hog Heaven, Inc. ("Hog Heaven"). GreatAmerica alleged that Wahoo breached a lease agreement and lease addendum and that Hog Heaven breached a guaranty. On September 17, 2009, Wahoo and Hog Heaven removed the action to this court on the basis of diversity jurisdiction.

On September 22, 2009, Wahoo and Hog Heaven filed a "Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, to Transfer to the Southern District of Florida" ("Motion to Dismiss") (docket no. 5). On February 4, 2010, the court held a hearing ("Jurisdictional Hearing") on the Motion to Dismiss. On February 8, 2010, GreatAmerica voluntarily dismissed Hog Heaven from this action. *See* Plaintiff's Dismissal of Hog Heaven, Inc. (docket no. 21).

On February 23, 2010, the court entered an Order (docket no. 26) denying Wahoo's

Motion to Dismiss. On March 5, 2010, Wahoo filed an Answer (docket no. 28).

On December 17, 2010, following a Final Pretrial Conference, the court entered a Final Pretrial Order (docket no. 41). On January 7, 2011, Wahoo filed a Trial Brief ("Wahoo Br.") (docket no. 42). On January 11, 2011, GreatAmerica filed a Trial Brief ("GreatAmerica Br.") (docket no. 43).

On January 18, 2011, the court held a bench trial on GreatAmerica's breach of contract claim. At the close of GreatAmerica's case, Wahoo moved for judgment as a matter of law ("Motion"). The court reserved ruling on the Motion and GreatAmerica's claim pending the instant Order.

### III. FACTUAL BACKGROUND

The parties stipulated to many facts. *See* Final Pretrial Order at 2-4. At trial, counsel for both parties asked that the court consider all of the testimony given at the Jurisdictional Hearing. Accordingly, the facts set forth below constitute the court's factual findings after considering the trial evidence and the evidence presented at the Jurisdictional Hearing.[1]

### A. Players

GreatAmerica is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. GreatAmerica provides financing alternatives to end-user customers of equipment manufacturers, vendors and suppliers that desire to lease, rent or purchase certain equipment or software for commercial use.

Wahoo and Hog Heaven are Florida corporations with their principal place of business in Islamorada, Florida. At all relevant times, Janeth Brody was the President and sole shareholder of Wahoo and Hog Heaven. Doug Young was the Vice President and Managing Director of Wahoo and Hog Heaven.

---

[1] The court makes additional findings of fact in conjunction with its legal conclusions.

Braza Lena, LLC is a Florida limited liability company.  At all relevant times, Janeth Brody was the sole owner, officer and member of Braza Lena, LLC.

Classico Investments of Florida, Inc. ("Classico") is a Florida Corporation with its principal place of business in Deerfield Beach, Florida.  At all relevant times, Janeth Brody was the President and sole shareholder of Classico.  Doug Young was the Vice President and Managing Director of Classico.  Classico employed Arietta Zekhti as the Office Manager for Wahoo, Hog Heaven and Braza Lena, LLC.

### B.  The Restaurants

Wahoo owns and operates three restaurants on the Whale Harbor Marina in Islamorada, Florida: Wahoo's Bar and Grill, Whale Harbor Seafood Buffet and Braza Lena Brazilian Steakhouse ("Islamorada Braza Lena") (collectively, the "Wahoo Restaurants"). Hog Heaven owns and operates Hog Heaven Sports Bar, another restaurant on the Whale Harbor Marina.  Braza Lena, LLC owns a second Braza Lena Brazilian Steakhouse, located in Key West, Florida ("Key West Braza Lena").  In July of 2008, Wahoo had an office in the Whale Harbor Seafood Buffet.  The fax number for Wahoo's office was 305-664-0692.

### C.  Sonny Leverock

On April 21, 2008, Classico hired Sonny Leverock as General Manager of the Wahoo Restaurants.  Leverock's employment agreement states that he was responsible for "OVERALL MANAGEMENT AND CONTROL OF THE PROPERTY CONSISTING OF THE THREE RESTAURANTS AND MARINA, AND SUCH OTHER RESTAURANTS OR PROPERTIES THAT THE COMPANY MAY DIRECT." GreatAmerica Exh. 12 (docket no. 45 at 58-60) at 2.  In addition to his duties at the Wahoo Restaurants, Young testified that Leverock was responsible for overseeing the construction of the Key West Braza Lena and had oversight responsibilities at Hog Heaven Sports Bar.

### D.  Wahoo Seeks Financing

In June 2008, Wahoo sought financing to acquire certain equipment for the restaurants.  At that time, four of the restaurants were operational.  The Key West Braza Lena was under construction, but opened in February of 2009.  Wahoo selected the particular equipment from ASI Communications ("ASI"), based on ASI's proposal.

Leverock selected the equipment supplier and negotiated the lease agreement at issue.  Young described Leverock as Wahoo's point man in negotiating the lease.  Leverock's responsibilities also included supervising the installation of the equipment.

### E.  The Lease Agreement

On July 4, 2008, Brody signed a "Lease Agreement" on behalf of Wahoo.[2]  GreatAmerica Exh. 1 (docket no. 45 at 1-4) at 1.

Among others, the Lease Agreement includes the following provisions:

> 1.     LEASE AGREEMENT:  You agree to lease from us and we agree to lease to you, the equipment listed on this lease or any schedule.  You unconditionally promise to pay us the sum of all of the rental payments indicated on the first page of this Lease or on any schedule.  You authorize us to insert in this Lease any serial numbers and other identification data about the equipment as well as any other omitted factual matters.

> 2.     UCC-ARTICLE 2A:  You agree that this Lease is a "Finance Lease" under Article 2A of the Uniform Commercial Code ("UCC").  You acknowledge that: (a) we did not select, manufacture or supply the equipment, but at your request we have purchased the equipment for lease to you; and (b) based

---

[2] On August 21, 2008, Young executed a second, identical copy of the Lease Agreement on behalf of Wahoo because the broker could not locate the original signed copy.  *See* GreatAmerica Exh. 10 (docket no. 45 at 54-56).  Although GreatAmerica will finance transactions based on fax or email copies of a lease agreement, it requires the broker to later send the original.  Because the broker was unable to find the original, GreatAmerica asked Wahoo to sign another copy.

on your own judgment, you have selected the vendor, supplier or manufacturer of the equipment (hereafter the "Supplier"), and you have selected the particular equipment that you are leasing from us. . . . To the extent permitted by applicable law, you waive any and all rights and remedies conferred upon you under UCC Sections 2A-303 and 2A-508 through 522.

3. NO WARRANTIES: We are leasing the equipment to you "AS IS." WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF NONINFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR ORDINARY USE IN CONNECTION WITH THIS LEASE. YOU UNDERSTAND AND AGREE THAT WE ARE INDEPENDENT FROM THE SUPPLIER OF THIS EQUIPMENT. . . . YOU AGREE THAT ANY BREACH BY THE SUPPLIER OR OTHER PERSON WILL NOT RELIEVE OR EXCUSE YOUR OBLIGATIONS TO US. . . .

4. NON-CANCELABLE LEASE: THIS LEASE CANNOT BE CANCELED BY YOU FOR ANY REASON.

. . .

6. TERM OF LEASE, ADMINISTRATIVE FEE: The Lease term will start on the date that you confirm acceptance of the equipment (the "Commencement Date") and will continue until you have met all of your obligations under the Lease. . . . The initial payment is due upon signing the Lease as described on page 1 hereof. The first rental payment is due 30 days after the Commencement Date. Thereafter, your rental payments will be due on the same day of each succeeding month. Daily rent shall be due for the period from the date that any item of equipment is installed to the Commencement Date calculated at a rate of 1/30 of the monthly rental payment for each day. . . . YOUR OBLIGATION TO PAY RENTALS TO US IS UNCONDITIONAL AND IS NOT SUBJECT TO ANY REDUCTION, SET-OFF, DEFENSE, OR COUNTERCLAIM FOR ANY REASON WHATSOEVER. . . . On the Commencement Date of this Lease, you shall pay to us a one-

time administrative fee, not to exceed $250.

. . .

9.    CARE,   USE,   AND   LOCATION;   LOSS   OF
EQUIPMENT:  You are responsible for installing and keeping
the equipment in good working order and repair. . . .  You are
responsible for protecting the equipment from damage, except
for ordinary wear and tear, and from any other kind of loss
while you have the equipment or while it is being delivered to
you.  In the event the equipment is lost or damaged, so long as
you are not in default under this Lease, then you shall have the
option to: (a) repair or replace the equipment, or (b) pay to us
both the unpaid balance of the remaining rent under the Lease
and our residual interest in the equipment, present valued,
using a discount rate of six (6%) percent per year.

. . .

13.    DEFAULT AND REMEDIES:  If you do not pay rent
when due, or if you break any of your promises under this
Lease or any other agreement with us, . . . you will be in
default.   If you default we can require that you return the
equipment to us and pay to us the remaining balance of all of
the rental payments due under the Lease, present valued using
a six (6%) percent per year discount rate.  If you fail to return
the equipment to us, in addition we can also require that you
pay to us our residual interest in the equipment, present valued
as noted above . . . .  If you default we shall also be entitled
to recover from you all damages caused by that default.  We
can also use any of the remedies available to us under the
[UCC] or any other law . . . .  Although you agree that we are
not obligated to do so, if we decide to sell the equipment, and
we are able to sell the equipment for a price that exceeds the
sum of (a) our cost of repossession of the equipment and (b)
the residual value of the equipment, present valued as
calculated above, then we shall give you a credit for the
amount of such excess.

GreatAmerica Exh. 1 at 2-3.

The Lease Agreement calls for an initial payment of $4,735.56, the total of the first

and last monthly payments. Wahoo made this payment at the time of signing. The Lease Agreement requires sixty monthly rental payments of $2,367.78, plus applicable taxes and insurance.

### F. Telephone Verification

Holly Deeds, a documentation specialist at GreatAmerica, worked on the Wahoo transaction. On July 10, 2008, Quinn Scullion, a representative of Wahoo's lease broker, POS Credit Corporation ("POS"), emailed Deeds the Lease Agreement. Scullion told Deeds she should contact Leverock about commencing the lease, and gave Deeds a phone number.

That same date, Deeds conducted a telephone verification.[3] Deeds spoke first with Wahoo's office manager, Zekhti, who told Deeds that the equipment was going to three locations but that not all of it had been installed. Zekhti also told Deeds that some of the equipment was going to a separate corporate entity, Hog Heaven.

Later that day, Deeds again called Wahoo's office and spoke with Leverock. Leverock told Deeds that while not all of the equipment had been installed, GreatAmerica should pay the equipment vendor and start the lease. Leverock confirmed to Deeds that the equipment was going to multiple locations and that some of it had been installed. However, he also told Deeds that Wahoo and the vendor were holding some of the equipment until the location—presumably the Key West Braza Lena—was completed. At this point, Deeds understood that although some of the equipment was not yet installed, it actually existed and was located somewhere.

Because not all of the equipment had been installed, and because some of the equipment was going to Hog Heaven, Deeds was unable to commence the lease. Deeds

---

[3] GreatAmerica performs a telephone verification prior to financing a transaction "to verify the lease terms and confirm acceptance of the equipment prior to funding." GreatAmerica Br. at 6 n.1.

contacted GreatAmerica's credit department and explained the situation. The credit department told Deeds that she could proceed with the transaction if GreatAmerica got a corporate guaranty from Hog Heaven and a lease addendum that authorized GreatAmerica to start the lease even though not all of the equipment had been delivered or installed.

Deeds asked Leverock if Brody could sign the necessary documents, and Leverock said he did not think it would be a problem. Leverock gave Deeds a fax number of 305-664-0692.

Later that day, Deeds sent the following fax to Leverock at the above number:

> Following are two forms that we need [Brody] to sign. The first is a guaranty form for her to sign on behalf of Hog Heaven. The second is an addendum which gives us the OK to release payment in full for the equipment and start the lease. Since you are not in possession of all of the equipment at this time this is the form we need.

GreatAmerica Exh. 3 (docket no. 45 at 6-8) at 1. Deeds attached a corporate guaranty and addendum to her fax. Deeds asked that Brody, rather than Leverock, sign the documents because Brody had signed the Lease Agreement and was the President of Wahoo and Hog Heaven. Deeds also explained that a corporate officer, such as Brody, needed to sign the lease addendum. It is not unusual for Deeds to ask a general manager to obtain someone else's signature. At this point, Deeds did not sense anything problematic or unusual about the transaction.

### G. The Addendum

On July 11, 2008, Leverock faxed a "Corporate Guaranty" ("Guaranty") back to Deeds. GreatAmerica Exh. 4 (docket no. 45 at 9) at 1. The Guaranty bears the signature "Janeth Brody" next to a handwritten "Janeth Brody Owner." *Id.*

Leverock also faxed Deeds an "Addendum to Lease and Lessee Acceptance and Authorization for Funding Prior to Delivery/Installation of Equipment" ("Addendum"). GreatAmerica Exh. 5 (docket no. 45 at 10) at 1. Leverock's fax came from the same

9

number to which Deeds faxed the documents the previous day.

The Addendum provides, in part:

> A.     You negotiated with Your vendor, ASI Communications ("Vendor"), to acquire the equipment described in the Lease (the "Equipment"). Per your request, we will advance all or a substantial portion of the total costs of the Equipment (the "Equipment Payment") to Vendor. We will advance the Equipment Payment to Vendor, however, only after confirming herein that You have made an unconditional commitment to fulfill all payment and non-payment obligations in the Lease and this Addendum.

> B.     We will rely on Your obligations under the Lease and this Addendum in making the Equipment Payment to Vendor prior to Your receipt and acceptance of the Equipment under the Lease.

> Each party hereby agrees that the Lease is amended as follows:

> 1.     Although the Equipment has not been delivered to You, You hereby request and authorize Us to advance the Equipment Payment to Vendor.

> 2.     To induce Us to make any Equipment Payment to Vendor prior to your receipt and acceptance of the Equipment under the Lease, YOU AGREE THAT YOUR OBLIGATIONS UNDER THE LEASE HEREBY IMMEDIATELY COMMENCE and that the First Monthly Rental Payment under the Lease will be due and owing on the date indicated on Our initial invoice to You. . . . YOU FURTHER AGREE THAT THE LEASE IS <u>NON-CANCELABLE</u> AND THAT YOU WILL TIMELY PERFORM ALL OF YOUR OBLIGATIONS UNDER THE LEASE, INCLUDING MAKING THE MONTHLY RENTAL PAYMENTS, WITHOUT ANY CLAIM OF SET-OFF, EVEN IF: (a) SOME OR ALL OF THE EQUIPMENT IS NOT DELIVERED AND/OR INSTALLED; (b) THE EQUIPMENT IS UNTIMELY DELIVERED AND/OR UNTIMELY INSTALLED AND/OR (c) THE EQUIPMENT DOES NOT, AT THE TIME OF DELIVERY OR

THEREAFTER, OPERATE PROPERLY OR THERE IS
ANY OTHER NONCONFORMANCE IN THE EQUIPMENT
OR IN ANY SERVICE. You further agree that You will have
no claim or defense against Us and that we shall be entitled to
enforce the Lease against You.

GreatAmerica Exh. 5 at 1.

As the "Lessee Signature," the Addendum bears the initials "J.B." above a handwritten "Janeth Brody Owner." *Id.* The Addendum also contains an "UNCONDITIONAL GUARANTY" by Hog Heaven, and this portion of the Addendum bears the signature "Janeth Brody." *Id.*

When she received the Addendum and Guaranty, Deeds checked to make sure they were signed by Brody. Deeds compared the signatures with that on the Lease Agreement and believed Brody signed all of the documents. At the Jurisdictional Hearing and at trial, Deeds acknowledged that the signatures look different, but she still believes they could have been signed by the same person. In fact, Deeds believes Brody signed all three documents. Deeds testified that in prior transactions, the same person has signed their name differently at different times. At this point, Deeds did not believe there was any cause for concern about going forward with the transaction.

Because GreatAmerica typically requires lessees to sign their full name rather than initials, Deeds spoke with GreatAmerica's vice president of operations. They concluded the Addendum was sufficient because, in addition to the initials J.B., it bore Brody's full signature with respect to the unconditional guaranty. On July 15, 2008, Deeds received the original copies of the Addendum and Guaranty by mail.

### H. Parties' Performance

On July 11, 2008, GreatAmerica financed the transaction by sending $108,664.44 to Wahoo's lease broker, POS. ASI, the equipment supplier, was responsible for delivering the equipment.

In July of 2008, GreatAmerica began sending monthly invoices to Wahoo. *See*

GreatAmerica Exh. 8 (docket no. 45 at 13-42). On August 7, 2008, Wahoo made its first regularly-scheduled rental payment. As part of its August invoice, GreatAmerica included a one-time documentation fee, which Wahoo paid.[4] Wahoo proceeded to make eight additional monthly payments. Young, Wahoo's Vice President, signed each check. When he made these payments, Young knew that not all of the equipment had been installed.

After its April 2009 payment, Wahoo ceased making monthly payments. On or about April 17, 2009, Wahoo informed GreatAmerica that it would stop paying on the Lease Agreement because not all of the equipment had been delivered and some of the equipment that was delivered was not working properly. Between July of 2008 and April of 2009, Wahoo did not tell GreatAmerica that it was rejecting any part of the equipment subject to the Lease Agreement. During this time, Young did not try to inspect the equipment in ASI's possession, and he does not know if anyone else from Wahoo did.[5]

### I. Wahoo's Dispute with ASI

In April of 2009, Wahoo had a dispute with ASI regarding ASI's alleged improper use of a credit card. Although he does not recall exactly when it occurred, Young testified that Wahoo and ASI eventually parted ways. In April of 2009, Young knew that the installation of the equipment was not complete. However, he understood that the equipment had been ordered, existed in a warehouse and was under ASI's control. After

---

[4] The documentation fee was the one-time administrative fee called for by the Lease Agreement. The Lease Agreement provides that Wahoo would be required to pay this fee "[o]n the Commencement Date of this Lease . . . ." GreatAmerica Exh. 1 at 2.

[5] At trial, Wahoo offered Exhibits F, G and H. Exhibit F is a contract message history report regarding GreatAmerica's dealings with Wahoo. Exhibits G and H are letters from Wahoo's counsel to GreatAmerica regarding the execution of the Addendum and the delivery of the equipment. GreatAmerica objects to Exhibits F, G and H as hearsay. Even considering this evidence, the court concludes that GreatAmerica is entitled to judgment in its favor. Accordingly, the court overrules GreatAmerica's objections and has considered Exhibits F, G and H.

its dispute with ASI, Wahoo did not attempt to find a different supplier or installer to complete the installation of the equipment.

### J. Wahoo Fires Leverock

On May 20, 2009, Wahoo terminated Leverock as General Manager effective May 13, 2009. A termination form reflects that Wahoo fired Leverock for "Neglect of Duty/Willful" conduct. GreatAmerica Exh. 13 (docket no. 45 at 61) at 1. Young testified that Leverock was fired due to his third drunk driving arrest. Young has no proof that Leverock did anything for his own personal gain during his employment.

### K. Brody's Alleged Signature on the Addendum

Wahoo claims that Brody's purported signature on the Addendum is a forgery. In fact, Young testified that he did not learn that Brody's alleged signature was on the Addendum until after Leverock's termination. Young does not know who signed Brody's name to the Addendum. However, he never discovered evidence to suggest someone other than Leverock did so. In her deposition, Zekhti testified that the handwriting on the Addendum and Guaranty is similar to Leverock's.

Young testified that in July of 2008, he had no knowledge that Leverock was discussing with GreatAmerica the prospect of an addendum to the Lease Agreement. Despite acknowledging that Leverock was authorized to negotiate the lease, select the supplier and broker and oversee the installation of the equipment, Young testified that Leverock was not authorized to sign a document such as the Addendum. Young also testified that Leverock lacked authority to give GreatAmerica permission to start the lease by releasing the funds.

### IV. ANALYSIS

The court first addresses the issue of liability on GreatAmerica's claim that Wahoo breached the Lease Agreement and Addendum. Then, the court considers the issue of damages.

*A. Liability*

Wahoo argues, and GreatAmerica concedes, that some of the equipment subject to the Lease Agreement was not delivered. The parties' dispute focuses on the legal consequences of this fact.

*1. Hell or high water clause*

GreatAmerica argues that the Lease Agreement contains a hell or high water clause.[6] "[A] hell or high water clause makes a lessee's obligation under a finance lease irrevocable upon acceptance of the goods, despite what happens to the goods afterwards." *GreatAmerica Leasing Corp. v. Star Photo Lab, Inc.*, 672 N.W.2d 502, 504 (Iowa Ct. App. 2003). The effect of such a clause is "that a lessor's breach of its duty to perform is a separate and distinct issue from the lessee's duty to make its lease payments." *Citicorp of N. Am., Inc. v. Lifestyle Commc'ns Corp.*, 836 F. Supp. 644, 656 (S.D. Iowa 1993). Federal and state courts have uniformly upheld the validity of hell or high water clauses. *See id.* at 656 & n.21 (collecting cases).

In its Brief, Wahoo appears to concede that the Lease Agreement contains a hell or high water clause. *See* Wahoo Br. at 3 (arguing that a lessee's inspection and acceptance rights apply "even when there is a . . . 'hell or high water' clause in the lease agreement"). However, at trial, Wahoo's counsel questioned whether the Lease Agreement contains a true hell or high water clause.

The court need not resolve this issue. "If an agreement qualifies as a finance lease under the UCC, an express hell-or-high-water clause is unnecessary because such a provision automatically attaches to a finance lease by statute." *C & J Vantage Leasing Co. v. Wolfe*, __ N.W.2d __, No. 08-1100, 2011 WL 744633, at *8 (Iowa Mar. 4, 2011).

_____

[6] GreatAmerica points to the following provision: "NON-CANCELABLE LEASE: THIS LEASE CANNOT BE CANCELED BY YOU FOR ANY REASON." GreatAmerica Exh. 1 at 2.

Specifically, Iowa law provides that "[i]n the case of a finance lease . . . the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods." Iowa Code § 554.13407(1). As the parties themselves agreed, the Lease Agreement is a finance lease. *See* Iowa Code § 554.13103(1)(g) (defining a finance lease); Iowa Code Ann. § 554.13103, cmt. g ("If a transaction does not qualify as a finance lease, the parties may achieve the same result by agreement."). Thus, even if the Lease Agreement does not contain an express hell or high water clause, such a provision would automatically attach to the Lease Agreement upon Wahoo's acceptance of the goods.

### 2.    *Parties' arguments*

Even assuming the Lease Agreement contains a hell or high water clause, Wahoo argues it cannot be enforced in this case. Specifically, Wahoo contends that acceptance of goods is a prerequisite to the enforcement of a hell or high water clause. Wahoo argues that "because much of the equipment was never delivered to Wahoo, it was never subject to inspection or accepted by Wahoo." Wahoo Br. at 3. Wahoo submits that it is entitled to "cancel the lease as to the undelivered equipment and deduct the value and other damages from the portion of the contract that Wahoo was otherwise required to pay." *Id.* at 1. Wahoo also raises two alternative arguments. First, it contends that GreatAmerica bore the risk of loss with respect to any undelivered equipment. Second, Wahoo argues that interpreting the Lease Agreement to waive Wahoo's delivery, inspection and acceptance rights makes the agreement unconscionable at the time it was made.

GreatAmerica contends that Wahoo's arguments regarding delivery are without merit for four reasons:

> (1) the Addendum requires payment even without full delivery; (2) Wahoo induced GreatAmerica to provide the funding without full delivery; (3) Wahoo ratified any issues with Leverock commencing the Lease Agreement by making nine payments and using the equipment that was installed; and

(4) Wahoo accepted the equipment within the meaning of the U.C.C.

GreatAmerica Br. at 10-11.

### 3. Lack of delivery is not a defense

"[T]he protection of section 554.13407 only attaches for the lessor 'upon the lessee's acceptance of the goods.'" *Star Photo Lab*, 672 N.W.2d at 505 (quoting Iowa Code § 554.13407(1)). GreatAmerica does not dispute this point, noting that "a 'hell or high water' clause renders a lessee's obligation in an equipment lease irrevocable *upon acceptance* of the goods." GreatAmerica Br. at 11 (emphasis added). Nonetheless, GreatAmerica contends that "Wahoo waived lack of delivery as a contractual requirement in the written Addendum to the Lease Agreement." *Id.*

In the Addendum, Wahoo authorized GreatAmerica to pay the equipment supplier although some of the equipment had not been delivered. The Addendum also states that, to induce GreatAmerica to pay the supplier prior to Wahoo's receipt and acceptance of the equipment, Wahoo agrees that its "OBLIGATIONS UNDER THE LEASE HEREBY IMMEDIATELY COMMENCE . . . ." GreatAmerica Exh. 5 at 1. Finally, the Addendum provides:

> YOU FURTHER AGREE THAT THE LEASE IS <u>NON-CANCELABLE</u> AND THAT YOU WILL TIMELY PERFORM ALL OF YOUR OBLIGATIONS UNDER THE LEASE, INCLUDING MAKING THE MONTHLY RENTAL PAYMENTS, WITHOUT ANY CLAIM OF SET-OFF, EVEN IF: (a) SOME OR ALL OF THE EQUIPMENT IS NOT DELIVERED AND/OR INSTALLED . . . .

*Id.* The court agrees with GreatAmerica that, if enforceable, the Addendum means that "Wahoo would be responsible to make all of the Lease Agreement payments even if all the equipment had not been delivered." GreatAmerica Br. at 11.

Assuming Brody did not sign her name to the Addendum, GreatAmerica argues the evidence supports a finding that Leverock did so. The court agrees. Deeds faxed the

Addendum to Leverock at Wahoo's office, asking that Brody sign the document. The following day, Deeds received a fax from the same number, which included the Addendum bearing Brody's signature. Zekhti testified that Brody's purported signature appears to be Leverock's handwriting, and Young acknowledged a lack of evidence suggesting that anyone other than Leverock procured Brody's purported signature. Based on this evidence, the court finds that Leverock signed Brody's name to the Addendum.

Even if Leverock was not authorized to sign the Addendum, and forged Brody's signature, Wahoo may be bound to its terms. Assuming Leverock fraudulently signed Brody's name to the Addendum, it is "well settled that a principal is responsible for the fraud of his agent if he has entrusted to the agent a matter which puts him in a position to perpetrate the fraud complained of while the agent is executing the transaction within the scope of his employment." *Mechanicsville Trust & Sav. Bank v. Hawkeye-Security Ins. Co.*, 158 N.W.2d 89, 91 (Iowa 1968). "The basis of the rule is that ordinarily knowledge of an agent is imputed to the principal." *Id.* An exception to this rule exists where the agent's conduct and dealings "clearly raise a presumption that he would not communicate the fact in controversy" to his principal, perhaps to conceal a fraudulent scheme. *Id.*

In this case, Leverock was Wahoo's point man in negotiating the Lease Agreement. He was responsible for selecting the equipment supplier and broker, as well as overseeing the installation of the equipment. Given these facts, the court concludes that Leverock was acting within the scope of his employment when he procured the Addendum bearing Brody's signature. Further, the exception discussed above is inapplicable here, where Leverock's conduct raises no presumption that he was perpetrating a fraud on Wahoo or would otherwise conceal the Addendum. Leverock procured the signed Addendum for Wahoo's benefit. It allowed Wahoo to get immediate financing from GreatAmerica, which in turn allowed Wahoo to begin installing the equipment. Accordingly, Leverock's knowledge regarding the Addendum is imputed to Wahoo.

Because the Addendum is enforceable, the court concludes that GreatAmerica is entitled to judgment in its favor on its breach of contract claim.  In the Addendum, Wahoo expressly authorized GreatAmerica to pay the equipment vendor prior to Wahoo's receipt and acceptance of all the equipment.  Wahoo further agreed that its obligations under the Lease Agreement would commence immediately, and it would perform such obligations even if the equipment was not delivered, it was delivered untimely or was nonconforming.

Wahoo insists that its "rights to delivery, inspection, and acceptance under the UCC could not be waived."  Wahoo Br. at 5.  Wahoo cites no authority for this proposition, and the UCC itself provides that the effect of its provisions "may be varied by agreement."  Iowa Code § 554.1302.  In any event, the court agrees with GreatAmerica that "[t]he actual delivery and receipt of equipment is not an absolute requirement to enforce an equipment lease as to the finance lessor."  GreatAmerica Br. at 14.  This is particularly true in light of the Addendum.  *See Hudson Highlands Veterinary Med. Group, P.C. v. Veterinary Equip. & Tech. Supply, LLC*, 390 F. Supp. 2d 393, 395 (S.D.N.Y. 2005) (dismissing lessee's claim against finance company for failure to deliver equipment because the lessee executed a "Lease Commencement Addendum" that provided "the Lease shall commence on the Commencement Date even though the Equipment has not been delivered"); *see also Hinkel Excavation & Construction, Inc. v. Construction Equipment Int'l, Ltd.*, No. C00-4090-MWB, 2001 WL 34008497, at *6-7 (N.D. Iowa Apr. 10, 2001) (enforcing lease with hell or high water clause although equipment was never delivered).

### 4.     *Risk of loss*

Wahoo argues it is entitled to cancel the Lease Agreement as to the undelivered equipment because GreatAmerica bore the risk of loss.  Wahoo relies on Iowa Code section 554.13219(2)(a)(2), which provides that "the risk of loss passes to the lessee when the goods are there duly so tendered as to enable the lessee to take delivery."  Wahoo also points to the Lease Agreement, which states that Wahoo is responsible for "protecting the

equipment from damage . . . and from any other kind of loss while [Wahoo] ha[s] the equipment or while it is being delivered to [Wahoo]." GreatAmerica Exh. 1 at 2. Thus, according to Wahoo, "the risk of loss does not pass until delivery has at least begun." Wahoo Br. at 5.

Having concluded that the Addendum is enforceable, the court must reject this argument. In the Addendum, Wahoo agreed that its obligations under the Lease Agreement would commence immediately. It also agreed that the Lease Agreement was non-cancelable, meaning Wahoo would be required to meet its obligations even if the equipment was delivered untimely, was not delivered at all or failed to operate properly. Finally, Wahoo agreed that it would "have no claim or defense against [GreatAmerica] and that [GreatAmerica] shall be entitled to enforce the Lease [Agreement] against [Wahoo]." GreatAmerica Exh. 5 at 1. In short, Wahoo "made an unconditional commitment to fulfill all payment and non-payment obligations in the Lease [Agreement] and th[e] Addendum." *Id.* "[T]he effect of provisions of [the UCC] may be varied by agreement." Iowa Code § 554.1302; *cf.* Iowa Code § 554.13219(2) (describing when risk of loss passes and noting that such rules apply if "the time of passage is not stated"). The exact purpose of the Addendum was to allow GreatAmerica to fund the transaction prior to delivery of the equipment. Regardless of whether GreatAmerica bore the risk of loss under the UCC, the terms of the Addendum make clear that Wahoo agreed to meet its obligations under the Lease Agreement even if no equipment was delivered.

### 5. *Unconscionability*

Wahoo also argues that if the Lease Agreement is interpreted "to waive Wahoo's rights to delivery, inspection, and acceptance" then it "would be unconscionable at the time the lease was made." Wahoo Br. at 6. A court may refuse to enforce an unconscionable lease contract or clause if it was unconscionable at the time it was made. Iowa Code § 554.13108. "A contract is unconscionable where no person in his or her

19

right senses would make it on the one hand, and no honest and fair person would accept it on the other hand." *C & J Vantage Leasing*, 2001 WL 744633, at *11. In addressing an unconscionability argument, a court must consider factors such as assent, unfair surprise, notice, disparity of bargaining power and substantive fairness. *Id.* "However, the doctrine of unconscionability does not exist to rescue parties from bad bargains." *Id.*

Neither the Lease Agreement nor the Addendum—or both taken together—are unconscionable. Wahoo offers no argument on several of the factors identified above. However, the court concludes they do not support a finding of unconscionability. There is no evidence of unequal bargaining power, unfair surprise or a lack of notice or assent.

With respect to substantive unfairness, Wahoo claims it "obviously would not have entered a lease agreement which left it with no rights to delivery, inspection, or acceptance of the very equipment it was seeking to obtain." Wahoo Br. 6. However, the court does not see why this is so obvious. To the contrary, based on the trial evidence, it seems clear why Wahoo did enter into such an arrangement—it allowed Wahoo to get the necessary funding to acquire equipment for its restaurants. Because some of the equipment had not been delivered or installed, GreatAmerica was unwilling to pay the vendor and start the lease without some assurances that Wahoo would pay regardless of what happened with the delivery or installation of the equipment. Wahoo certainly could have chosen to forego immediate funding, and instead insist on complete delivery of the equipment. However, the court will not force GreatAmerica to bear the loss caused by Wahoo's desire to consummate the transaction sooner. After executing the Addendum and otherwise inducing GreatAmerica to fund the transaction, Wahoo's unconscionability argument fails.

### 6. *Other considerations*

Even if the Addendum were unenforceable, GreatAmerica raises three additional arguments in support of its claim: (1) Wahoo induced GreatAmerica to provide funding and therefore may not raise non-delivery as a defense; (2) Wahoo's actions ratified the

Lease Agreement; and (3) Wahoo accepted the equipment within the meaning of the UCC. In light of the court's conclusion that the Addendum is enforceable, it need not reach these issues. The court notes, however, that even if the Addendum were unenforceable, GreatAmerica still would prevail on its breach of contract claim on any or all of these grounds, for the reasons stated in GreatAmerica's Brief.

### 7. Conclusion

For the foregoing reasons, the court concludes that the Lease Agreement and Addendum are enforceable against Wahoo. Its arguments regarding lack of delivery, risk of loss and unconscionability fail. Because Wahoo concedes it failed to make the payments called for in the Lease Agreement, the court concludes that Wahoo breached the Lease Agreement and Addendum.

## B. Damages

Having concluded that Wahoo is liable to GreatAmerica on GreatAmerica's breach of contract claim, the court must address the issue of damages. Because the Motion is premised on the issue of damages, the court addresses it here as well.

### 1. The Motion

In moving for judgment as a matter of law, Wahoo contends that GreatAmerica failed to prove the amount of its damages with reasonable certainty.[7] Wahoo acknowledges that GreatAmerica presented evidence of the amounts paid and the amounts still owed under the Lease Agreement. However, it contends this evidence ignores several issues relevant to damages. Specifically, Wahoo argues it ignores the fact that some of the

---

[7] Wahoo bases this argument on the court's exclusion of GreatAmerica's Exhibit 14, which is an acceleration worksheet GreatAmerica offered as evidence of its damages. GreatAmerica attempted to offer the acceleration worksheet through Deeds. After Deeds acknowledged she had no role in preparing Exhibit 14 and her job responsibilities do not include preparing acceleration sheets or computing accelerated lease payments, the court excluded the acceleration sheet for lack of foundation.

equipment was going to Hog Heaven and ignores the resale value of the equipment if GreatAmerica were to repossess and sell it.

A plaintiff may not recover if it is speculative or uncertain whether it sustained damages. *Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 857 (Iowa 1973). However, "[i]f the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Id.* On this record, it is clear GreatAmerica sustained damages. The alleged uncertainty here, according to Wahoo, pertains only to the amount of damages.

### a.    *Hog Heaven*

Wahoo's argument with respect to Hog Heaven misses the point. Wahoo is the lessee under the Lease Agreement. Hog Heaven was merely a guarantor. The fact that some of the equipment was to be used by Hog Heaven—and GreatAmerica's knowledge of this fact—does not alter Wahoo's obligation as the lessee to pay rent under the Lease Agreement.

### b.    *Resale*

With respect to the resale issue, Wahoo correctly points out that the Lease Agreement provides, in the event of default, GreatAmerica may require Wahoo to return the equipment to GreatAmerica. It also gives GreatAmerica the right to resell the equipment and, if there is a surplus, credit Wahoo for the excess proceeds. The problem with Wahoo's argument is that this remedy is merely optional. The Lease Agreement provides that GreatAmerica "can require" Wahoo to return the equipment and that, "[a]lthough [GreatAmerica] is not obligated to do so," it may resell the equipment and credit Wahoo. GreatAmerica Exh. 1 at 3.

The Lease Agreement provides that GreatAmerica "can also use any of the remedies available to [it] under the [UCC] or any other law." *Id.* Under the UCC, if a lessee defaults the lessor may recover accrued and unpaid rent, rent for the remaining lease term

and incidental damages. *See* Iowa Code Ann. § 554.13529(1)(a). Where, as here, the lessee retains possession of the goods, the lessor may sue for the full unpaid rent. *See id.* at cmt. 1 ("[A]n action for the full unpaid rent . . . is available as to goods not lost or damaged only if the lessee retains possession of the goods . . . ."). However, "[i]f the lessee tenders goods back to the lessor, and the lessor refuses to accept the tender, the lessor will be limited to the damages it would have suffered had it taken back the goods." *Id.*

"To be effective a tender must be absolute and unconditional." *Decorah State Bank v. Zidlicky*, 426 N.W.2d 388, 391 (Iowa 1988). "Tender is an unconditional offer to perform a condition or obligation. The party making tender must have the ability for immediate performance. The tender must be absolute and unconditional to be effectual." *Hill Petroleum Co. v. Pathmark Int'l, Inc.*, 759 F. Supp. 722, 727 (D. Kan. 1991). The Lease Agreement puts the onus on Wahoo to return the equipment. While the record is somewhat unclear in this respect, it appears, at most, that Wahoo invited GreatAmerica to come to Florida and take the equipment if GreatAmerica was able to identify it. The court concludes that Wahoo did not tender the equipment back to GreatAmerica.

Further, to the extent the UCC imposes an obligation on GreatAmerica to take possession of the equipment and attempt to resell or sublet it, "the lease agreement may include rights and remedies for default in addition to or in substitution for those provided in [the UCC] and may limit or alter the measure of damages recoverable under this article." Iowa Code § 554.13503; *see also* Iowa Code Ann. § 554.13529 cmt. 1 ("*Absent a lease contract provision to the contrary*, an action for the full unpaid rent . . . is available . . . only if the lessee retains possession of the goods or the lessor is or apparently will be unable to dispose of them at a reasonable price after reasonable effort." (emphasis added)). Given the Lease Agreement's permissive language with respect to GreatAmerica's remedies, the court concludes that GreatAmerica was under no obligation

to take possession of the equipment and attempt to resell it.

### c.    *Proof of amount of damages*

With respect to the amount of GreatAmerica's damages, GreatAmerica offered proof of the amounts paid and amounts still owed under the Lease Agreement. This evidence, coupled with the term of the Lease Agreement, is sufficient "proof of a reasonable basis from which the amount can be inferred or approximated." *Northrup*, 204 N.W.2d at 857. Accordingly, the court shall deny the Motion.

### 2.    *Amount of damages*

The Lease Agreement calls for sixty monthly rental payments of $2,367.78, plus applicable taxes and insurance. Deeds testified that GreatAmerica paid tax on the equipment purchase up front, and then distributed that amount across Wahoo's monthly payments. With tax, Wahoo's standard monthly payment under the Lease Agreement is $2,598.56.

As previously noted, Wahoo made an initial payment of $4,735.56, which is equal to the first and last payments under the Lease Agreement. Wahoo also made nine additional monthly payments from July of 2008 through April of 2009. After its payment in April of 2009, Wahoo ceased making any payments.

Thus, of the sixty required rental payments, forty-nine remain owing. Of these, twenty-four payments—from May of 2009 through April of 2011—are currently past due. The total of these past due payments, including tax, is $62,365.44. GreatAmerica is entitled to this amount as part of its damages. *See* Iowa Code § 554.13529(1)(a) (providing that the lessor may recover "accrued and unpaid rent as of the date of entry of judgment").

The remaining twenty-five payments must be discounted to present value "using a six (6%) percent per year discount rate." GreatAmerica Exh. 1 at 3. The total present value of the future payments, including tax, is $60,924.90. GreatAmerica is entitled to

this amount as part of its damages. *See* Iowa Code § 554.13529(1)(a) (providing that lessor may recover the present value as of the date of judgment "of the rent for the then remaining lease term of the lease agreement"). The court concludes that GreatAmerica is entitled to $123,290.34 in damages for Wahoo's breach of the Lease Agreement and Addendum.

## V. CONCLUSION

In light of the foregoing, it is **HEREBY ORDERED THAT**:

(1)     Wahoo's motion for judgment as a matter of law is **DENIED**;

(2)     GreatAmerica is entitled to judgment in its favor on its claim that Wahoo breached the Lease Agreement and Addendum; and

(3)     The Clerk of Court is **DIRECTED** to enter judgment in GreatAmerica's favor and against Wahoo in the amount of $123,290.34.

**IT IS SO ORDERED.**

**DATED** this 21st day of April, 2011.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA